UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| MIKE JENKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:07CV123 CDP |
| | ) |
| FITZGERALD MARINE | ) |
| & REPAIR, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Mike Jenkins was injured while working for his employer, Fitzgerald Marine & Repair, which repairs barges for Ingram Barge Company. At the time of his injury, Jenkins and others were attempting to keep one of Ingram's tugboats from sinking. He has sued both Fitzgerald and Ingram, and each of those parties has brought cross-claims against the other. Fitzgerald and Ingram have filed motions for summary judgment on the cross-claims. Because I conclude that under the contract between the two companies, Fitzgerald agreed to indemnify Ingram for injuries to its employees such as that alleged by Jenkins here, I will grant Ingram's motion for summary judgment.

## Background

Fitzgerald's primary business is the repair and maintenance of boats and barges – mostly those owned by Ingram – along the Mississippi river. Jenkins was

a crewmember aboard the Fitzgerald vessel *K.W.* On July 2, 2006, the *K.W.* crew aided in a rescue effort to save the Ingram tugboat *Charles Holman*. The rescue effort proved unsuccessful; the *Holman* sank. Jenkins alleges that he injured his back when he attempted to throw a water pump from the *K.W.* to the *Holman*.

Fitzgerald and Ingram have had a long-standing contractual relationship. Two written agreements in particular are relevant to the dispute here. The first of these was entered into on June 12, 2001. In that agreement, Fitzgerald agreed to provide the following services to Ingram:

(a) Repair of barges, towboats, and other vessels and any appurtenances, tackle, gear, or appliances of such vessels; and

(b) Such other services as may be agreed upon by the parties.

The agreement specified that Ingram was to provide Fitzgerald with at least 24 hours advance notice of any service requests. Under the heading "Equipment," the agreement notes that Ingram was required to "provide and maintain all equipment and supplies needed for the performance of services," including pumps.[1]

The agreement also contained an indemnity provision which read as follows:

<u>Indemnity</u>. [Fitzgerald] shall indemnify, hold harmless, and defend [Ingram] and its affiliated companies (including but not limited to

---

[1] An attached "In Fleet Repair Rates and Equipment Schedule" also specified that Ingram was to provide, with respect to in fleet repairs, "Pumps, hoses and all things associated with pumping."

Ingram Industries Inc. and Ingram Ohio Barge Co.), and its and their employees, agents, and vessels, from and against (a) any and all claims, liabilities, penalties, and expenses based upon or arising in connection with injury to or death of the employees or agents of [Fitzgerald] or its vendors or subcontractors, regardless of any negligence on the part of the party to be indemnified or unseaworthiness of any vessel owned, chartered, operated or controlled by such party, and (b) any other claims, liabilities, penalties, and expenses arising in connection with [Fitzgerald's] operations unless caused by the sole negligence of [Ingram] or its affiliates, or its or their employees, agents, or other contractors or subcontractors.

This agreement by its own terms expired on June 12, 2006, less than one month before Jenkins' injury. The parties agree, however, that it was extended by oral agreement, and Fitzgerald was still working for Ingram when Jenkins' claim arose. The parties entered a second written agreement in March 2003, and that second agreement was still in place at the time of Jenkins' injury. The second written agreement is identical in all material respects to the first and contains the same indemnity language.[2]

Although the text of the two agreements specifies that Ingram was to provide Fitzgerald with 24 hours notice of any service needs, in practice this was not done. Fitzgerald worked almost exclusively for Ingram, and the Fitzgerald crews worked twelve hour shifts each day from 6 a.m. to 6 p.m. At the beginning

---

[2]The parties dispute whether the Fitzgerald vessel *K.W.* was within the scope of this second agreement. None of this matters, however, because at the very least the *K.W.* was covered by the oral extension of the 2001 agreement.

of each day, Ingram would dispatch Fitzgerald repair boats to various maintenance and repair projects for that particular shift. Fitzgerald performed the majority of its work on Ingram barges, and rarely performed any services for Ingram tug boats or other vessels.

The day of Jenkins' injury, the *K.W.* was dispatched to work on two Ingram barges. The *K.W.* had finished its work for the day and was returning to the dock at approximately 4:30 p.m. when a distress call was issued regarding the *Holman*. The *Holman* was taking on water and was in danger of sinking, and all boats in the area were dispatched to aid in the rescue. It is unclear whether the *K.W.* crew was answering a general distress call or was answering a specific directive from Ingram to go to work on the *Holman*. It is undisputed, however, that the *K.W.* came to the aid of the *Holman*. Craig Poore, Sr., the captain of the *K.W.*, stated in his deposition that he was not given any specific instruction regarding the *Holman*, but was asked simply, "Can you save it?"

The *K.W.* and at least one other boat attempted to rescue to the *Holman*. Additional boats were nearby but refused to aid in the rescue effort because, according to Fitzgerald, the crew members of the other boats felt the job was too dangerous. Plaintiff Mike Jenkins described the situation he confronted as an emergency and said "none of us had ever handled a situation like this before."

The *K.W.* crew managed to set up one water pump and was attempting to set up a second when the *Holman* finally sank. Jenkins claims that he injured his back when he threw a 70-pound pump from the *K.W.* to the *Holman*. Additionally, he further injured himself when he cut loose a line tied to the *Holman* after it became apparent that the *Holman* could not be saved.

## **Discussion**

The standards for summary judgment are well settled. In ruling on summary judgment, the Court views the facts and inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Fitzgerald does not dispute that it worked largely for Ingram or that the *K.W.* was "on the clock" between the hours of 6 a.m. and 6 p.m. when the *Holman* rescue effort took place.  Fitzgerald also does not dispute that, under the terms of the written agreements, it is required to indemnify Ingram from any loss in the event that one of Fitzgerald's employees is injured while servicing an Ingram vessel.  Fitzgerald argues, however, that the indemnity provision does not apply to this particular situation involving Jenkins, because the rescue operation was an emergency that was not part of the work Fitzgerald did under its contract.  It also argues that the injury was caused by Ingram's own negligence in allowing the *Holman* to sink, and that Fitzgerald's arguments would render the indemnity provision so broad as to cover *any* situation in which an Ingram vessel injured a Fitzgerald employee, no matter how remote from the work of the two companies under the contracts.  It argues that at best, the applicability of the provision is in doubt because the indemnity clause is ambiguous, and the clause should therefore be construed against its drafter, Ingram.

Ingram argues that the rescue operation clearly fell within the scope of the services provided under the agreement.  Second, it argues that even if the rescue was outside of the agreement, the indemnity provision is explicit in its terms, and it extends to all injuries of Fitzgerald employees, even if caused by Ingram's

negligence or even if they did not arise in connection with Fitzgerald's contractual services.

The interpretation of an indemnity clause as part of a maritime contract is a matter governed by federal maritime law and not state law. *Capozziello v. Brasileiro*, 443 F.2d 1155, 1157 (2d Cir. 1971). *See also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1213-14 (5th Cir. 1986) (quoting 1 Benedict on Admiralty § 1983 (7th ed. 1985)) ("In order that maritime character should attach to a contract, there must be present a direct and proximate juridical link between the contract and the operation of the ship, its navigation or its management afloat.").

The parties here agree that the standard for interpreting an indemnity provision in a maritime contract is set forth in a Fifth Circuit case, *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). According to the Fifth Circuit,

> A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

*Corbitt*, 654 F.2d at 333. The contract should be read as a whole, and "a court should not look beyond the written language of the contract to determine the intent

of the parties unless the disputed language is ambiguous." *Fontenot*, 791 F.2d at 1214 (citing *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984)). In doing so, the court is required "to read all parts of a contract together to ascertain the agreement of the parties, while ensuring that each provision of the contract is given effect and none are rendered meaningless." *Instone Travel Tech Marine & Offshore v. International Shipping Partners, Inc.*, 334 F.3d 423, 428 (5th Cir. 2003).

The contract's indemnity provision contains two clauses: clause (a) covers injuries to Fitzgerald employees, and clause (b) covers any other claims. The parties agree that Jenkins' claim relates to the first clause. That clause contains no language limiting the indemnity to claims that arise within the scope of Fitzgerald's contractual work provided to Ingram. Instead, it applies to "any and all claims . . . related to any injury or death of the employees or agents of Fitzgerald . . . regardless of any negligence on the part of the party to be indemnified or the unseaworthiness of any vessel owned . . . by such party." There is no requirement that the employee suffer the injury while performing work specified in the contract. The only language limiting indemnification to claims that arise "in connection with Fitzgerald's operations" is contained in clause (b) – which is not relevant to this case. Indemnity for Jenkins' injury arises under clause (a). The fact that the limiting language is expressly contained in a second

clause necessarily means that it was not intended to be included in the first. *See Capozziello v. Barasileiro*, 443 F.2d 1155, 1158-59 (2d Cir. 1971) (contrasting two clauses in an indemnity provision and concluding "the inference is unmistakable that the omission of such limiting language" in one of the clauses was intentional).

But Fitzgerald maintains that there is a limitation implicit within the contract. Otherwise, the indemnity provision would be so broad as to cover any situation in which an Ingram vessel injured a Fitzgerald employee. Fitzgerald argues that because the second clause of the indemnity provision begins by referring to "any *other* claims, liabilities, penalties, and expenses arising in connection with Fitzgerald's operations," then the first clause must also be limited to claims "arising in connection with Fitzgerald's operations." Thus, argues, Fitzgerald, there is a necessary inference – or at least an ambiguity – that the first set of claims (those relating to employee injuries) must also arise within the scope of Fitzgerald's contractual work for Ingram. *See Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992) ("An indemnity clause will not afford protection unless its terms are expressed unequivocally.").

I conclude that this contract language is not ambiguous. The reference to "other claims" simply distinguishes claims of third parties, that is, people not related to Fitzgerald, from claims of related persons (Fitzgerald employees, agents,

vendors, and subcontractors). It does not matter whether the emergency operations here were done as part of the work under the contract, or whether Ingram itself was negligent. The language is clear, and there is no reason to go outside the language of the agreement.

Fitzgerald argues that this interpretation is not reasonable, and would lead to liability in unexpected situations, but this is the agreement it signed. Under general maritime law, indemnification for an indemnitee's own negligence must be "clearly and unequivocally expressed." *Seal Offshore, Inc. v. American Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir. 1984). A contract to indemnify another for his own negligence imposes an extraordinary obligation. Thus, an indemnitor "is entitled to express notice that under its agreement, and through no fault of its own, it may be called upon to pay damages caused solely by the negligence of its indemnitee." *Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc.,* 129 F. App'x 45, 55 (5th Cir. 2005) (quoting *Corbitt*, 654 F.2d at 333). Fitzgerald, by signing the document, explicitly undertook this extraordinary obligation, and I find no basis for reading an implicit limitation into it.

Additionally, I believe that the work did arise within the scope of Fitzgerald's contracted work for Ingram, so even if the clause is ambiguous, Ingram would still be entitled to indemnification. Requirements that a claim "arise in connection with" a contract have been liberally construed by maritime courts to

"unambiguously encompass all activities reasonably incident or anticipated by the principal activity of the contract." *Fontenot*, 791 F.2d at 1214 (citing *Hicks v. Ocean Drilling and Exploration Co.*, 512 F.2d 817 (5th Cir.1 975)). According to the Fifth Circuit in *Fontenot*,

> Where the presence of the injured person at the scene of the injury is attributable to or might reasonably be anticipated by his employment responsibilities, then his injuries occur "in connection with" those responsibilities. It is irrelevant that the person is not at that moment performing services or that the injury results from an activity not encompassed by the employer's contractual undertakings.

*Fontenot*, 791 F.2d at 1215. Jenkins' injury occurred when the *K.W.* crew was "on the clock" working for Ingram. Fitzgerald billed Ingram a full 12-hour shift for the *K.W.*, and Ingram paid for 12 hours of service. Fitzgerald was a marine repair company with the tools and expertise necessary to set up the water pumps and do what could be done to save the *Holman*. The service agreement specified that Fitzgerald would provide "repair of towboats," and "other services as may be agreed upon by the parties." Those are the services that were provided here, and the fact that they were services rendered in an emergency situation does not change the outcome. The agreement makes no exception for "emergency services" or emergency situations; there is no reason to conclude that the attempt to save the *Holman* should be excluded from the terms of the service agreement.

For the foregoing reasons, Ingram's motion for summary judgment on its own cross-claim and on Fitzgerald's cross-claim will be granted. Plaintiff Jenkins' claims against both defendants remain pending.

Accordingly,

**IT IS HEREBY ORDERED** that Ingram Barge Co.'s motion [#58] for summary judgment is GRANTED, and Ingram shall have judgment on its cross-claim and on the cross-claims brought against it by Fitzgerald.

**IT IS FURTHER ORDERED** that Fitzgerald marine Marine & Repair, Inc.'s motion for summary judgment [#60] on the cross-claim of Ingram Barge Co. is DENIED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of October, 2008.